DAVID P. MASTAGNI (SBN 57721)
GRANT A. WINTER (SBN 266329)
BRETT D. BEYLER (SBN 319415)
**MASTAGNI HOLSTEDT, A.P.C.**
1912 I Street
Sacramento, California 95811
Telephone: (916) 446-4692
Facsimile: (916) 447-4614
Email: bbeyler@mastagni.com

Attorneys for Plaintiffs
ALAN STRICKLAND and KELLY STRICKLAND

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ALAN STRICKLAND, an individual; and KELLY STRICKLAND, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> MASAI UJIRI, an individual; TORONTO RAPTORS, a business entity; MAPLE LEAF SPORTS & ENTERTAINMENT, a business entity; NATIONAL BASKETBALL ASSOCIATION, INC.; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 4:20-CV-00981-YGR <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT ANSWER AND COUNTERCLAIM** <br><br> Date:         Tuesday, September 22, 2020 <br> Time:         2:00 p.m. <br> Courtroom: 1, 19th Floor <br> Judge:        Hon. Yvonne Gonzalez Rogers |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................... i

I.      INTRODUCTION  ................................................................................................... 1

II.     STATEMENT OF ISSUES TO BE DECIDED ...................................................... 3

III.    STATEMENT OF FACTS & PROCEDURAL HISTORY .................................... 3

        A. Statement of Facts ......................................................................................... 3

IV.     ARGUMENT ......................................................................................................... 15

        A. Federal Rules of Civil Procedure 16(b)(4) ................................................. 16

        B. Federal Rule of Civil Procedure 15(a) ....................................................... 18

V.      CONCLUSION ...................................................................................................... 22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

1

## **TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

Byrd v. Guess, 137 F.3d 1126 (9th Cir. 1998) ................................................................. 16

4

Coleman v. Quaker Oats Co., 232 F.3d 1271, 1294 (9th Cir. 2000); ...................................... 2, 16

5

Foman v. Davis, 371 U.S. 178, 782 (1962) ........................................................................ 3, 16, 18

6

GetFugu, Inc. v. Patton Boggs, LLP, 220 Cal.App.4[th] 141, 153.......................................... 19

7

Hall v. Cole, 412 U.S., 1, 15 (1973) ................................................................................... 16, 18, 19

8

Howey v. United States, 481 F.2d 1187, 1191 (9th Cir. 1973)............................................. 18, 19

9

Janicki Logging Co. v. Mateer, 42 F.3d 561, 566-567 (9th Cir. 1994) ................................ 17

10

11

Jimena v. UBS AG Bank, Inc., 2011WL 13185645 *2,
   2011 WL 587309 *6, n. 5 (E.D. Cal. 2011) .................................................................... 17

12

Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 608 (9th Cir. 1992)......................... 16, 17

13

14

Millenkamp v. Davisco Foods Intern., Inc., 448 Fed.Appx. 720, 721 (9th Cir. 2011)............. 2, 18

15

Owens v. Kaiser Foundation Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001) .............. 22

16

Pulte Home Corp. v. American Safety Indemnity Co. (2017) 14 Cal.App.5[th] 1086 .................. 19

17

Stearns v. Select Comfort Retail Corp., 763 F.Supp.2d 1128 (Cal. N.D. 2010).................... 19, 21

18

Vincent v. Trend W. Technical Corp., 828 F.2d 563, 570-571 (9th Cir. 1987)............................ 18

19

20

Western States Wholesale Natural Gas Antitrust Litigation, 715 F., 17 716, 737
   (9th Cir. 2013)...................................................................................................... 16, 17

21

22

Zivkovic v. Southern Cal. Edison Co., 302 F.3d 1080, 1087 (9th Cir. 2002) ........................ 16, 17

23

**FEDERAL STATUTES & RULES**

24

25

Federal Rules 15(a)(2) and 16(b)(e)(4) ............................................................. 2, 3, 15, 16, 17, 18

26

Local Rule 5-1, 7-11, 79-5(d) and (e) ............................................................... 10, 13, 14, 19

27

Rule 21(a)(1)(A)(ii)........................................................................................... 14

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

1

## **<u>OTHER AUTHORITIES</u>**

2

Black's Law Dictionary 166 (10th ed. 2014)................................................................ 19

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

## I.   **INTRODUCTION**

Plaintiffs Alan Strickland and Kelly Strickland hereby oppose Defendants Masai Ujiri, Toronto Raptors, and Maple Leaf Sports & Entertainment's (hereinafter collectively referred to as "Defendants") Motion for Leave to File Amended Joint Answer and Counterclaim.

The evidence available in this case demonstrates that the National Basketball League created a security protocol requiring any person who wished to access the basketball court floor for the after-game celebration to have either a "Trophy Ceremony credential" or a specific yellow arm band. Communications from the NBA, including emails from NBA executives to the Toronto Raptors, clearly state that after the final buzzer, only the yellow arm band and Trophy Ceremony credential would allow access to the floor and there would be no exceptions. (*See, e.g.* Declaration of Brett Beyler ("Beyler Decl.") **Exh**. 5, p. NBA000180.)   These NBA security protocols and communications unequivocally state that at the sound of the end-of-game buzzer, all previously issued credentials were rendered **invalid** to access the floor. (*Id*.)   The photographic evidence submitted herein, and Masai Ujiri's own written discovery responses from this case, show that Ujiri did not have the required credentials to access the basketball court when he attempted to rush past Deputy Strickland to get to the floor. (Beyler Decl., **Exh**. 9; Exh. 12-13.)

Ujiri's proposed counterclaim attempts to obfuscate the fact that Ujiri did not have the necessary credential to access the floor. Ujiri repeatedly asserts that he had an "all-access credential that allowed him to access virtually every part of Oracle Arena, including the location he was at when he encountered Mr. Strickland." (Ujiri's Proposed Counterclaim, ¶ 17; *see also* Ujiri's Proposed Counterclaim, ¶¶ 18,19,23.) Similarly, Ujiri falsely claims that "Rather than trying to communicate with Mr. Ujiri, Mr. Strickland chose to dismiss Mr. Ujiri's claim that he was the Raptor's President and ignore the all-access credential Mr. Ujiri was trying to show him." (Ujiri's Proposed Counterclaim, ¶ 19.)

Ujiri deliberately and dishonestly chose not to plead the fact that he did not have the credential required to go onto the basketball court floor, which was only a few feet away from Strickland, and precisely the location that Strickland was assigned to guard. Ujiri may have had what he calls an

"all-access credential" but he did not have a credential to go to the one place where he was actually trying to go – the floor of the basketball arena. Ujiri's repetition of his claim that he had an "all-access credential" without admitting that he lacked the credential needed to get onto the court is a willful attempt to mislead the Court. It is also a willful attempt to mislead the media and the public and taint the jury pool. Deputy and Mrs. Strickland submit that this false and misleading claim is an act of bad faith undertaken for a bad faith purpose. As explained herein, bad faith motive constitutes grounds for denial of leave to amend under Federal Rules 15(a) and 16(b)(4).

Ujiri also alleges in his proposed counterclaim that Deputy Strickland is lying about having been hit in the face. (Ujiri's Proposed Counterclaim, ¶ 24.) Photographic evidence shows Ujiri's right hand on Strickland's face and left hand on the neck/face area in a double handed hitting motion. (Beyler Decl., **Exh**. 8.) This is another misleading statement made for the bad faith purpose of misleading the public, the media, and the Court.

Ujiri's moving papers assert that this motion is brought pursuant to both Federal Rules of Civil Procedure 15 and 16(b)(4). But leave to file the amendment and counterclaim cannot be granted under Rule 15 because the Court has already issued a pre-trial order specifically ordering that any amendments to the pleadings must come under Rule 16(b)(4). (May 11, 2020 Case Management and Pretrial Order, Docket No. 30, p. 1:15.) If the deadline to amend pleadings set in a court's pretrial scheduling order has passed, the legal standard for amending a pleading is governed by Rule 16, not Rule 15. (*See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000); Fed. R. Civ. P. 15(a)(2).) Therefore, Defendants' only option is to seek relief under Rule 16. Under Rule 16(b)(4), Defendants must show "good cause" as to why the Court should grant Defendants' untimely amendment. (*Millenkamp v. Davisco Foods Intern., Inc.,* 448 Fed.Appx. 720, 721 (9th Cir. 2011).)

As explained herein, Defendants cannot possibly meet the requisite "good cause" standard because all of the ostensible new facts upon which the counterclaim is based are things that Mr. Ujiri necessarily would have known long before he filed his original answer and long before the Court's Pre-trial scheduling order was issued. In particular, Ujiri asserts that he only just learned – through the course of discovery – that Strickland allegedly pushed him, which Ujiri claims gives rise to claims

2

for unreasonable force, assault, and battery. (Ujiri's Notice of Motion and Motion, p. 3:13-20.) But this is another misrepresentation. Ujiri did not just become aware of this ostensible fact. As shown herein, Ujiri's original answer pled that Strickland pushed him. Moreover, Ujiri was live and in-person at the basketball game when the incident with Strickland occurred. If Ujiri believes that Strickland pushed him Ujiri knew it then. He did not just find out in July 2020 when he saw a different camera angle. Thus, there is no good cause for the late filing under Rule 16(b)(4).

Alternatively, even if this motion for leave to amend was analyzed under Rule 15 – which it should not be – the request for leave would still lack merit. Bad faith motive behind a request for amended pleadings and prejudice to the non-moving party constitutes grounds for denial of a request for leave to amend pleadings. (*Foman v. Davis*, 371 U.S. 178, 782 (1962).) Here, Defendants' blatant and intentional misrepresentations of fact and clear efforts to mislead the Court and the public demonstrates bad faith, and causes prejudice towards Plaintiffs.

For these reasons, Plaintiffs submit that leave to amend should be denied.

## II.   STATEMENT OF ISSUES TO BE DECIDED

A.  Is there good cause to grant leave to amend under Federal Rule of Civil Procedure 16(b)(4) based upon Defendants' "recent discovery" of the alleged fact that Strickland pushed Ujiri, when Defendants pled that fact in their original answer, and Ujiri would have known that fact – assuming it is true – at the time of the incident on June 13, 2019?

B.  Under Federal Rule of Civil Procedure 15, have Defendants' brought this motion in bad faith in an effort to mislead the Court and the public, and to prejudice Plaintiffs, where they have deliberately misrepresented whether Ujiri possessed the proper credentials for going onto the basketball court, and whether Ujiri struck Strickland in the face?

## III.   STATEMENT OF FACTS & PROCEDURAL HISTORY

### A. Statement of Facts.

#### (i)    Background.

Mr. Strickland was injured at an extraordinary basketball game. It was Game 6 of the NBA Finals between the Toronto Raptors and the Golden State Warriors. Moreover, after 47 years at the

Oakland Coliseum, this was the last game the Warriors would ever play there. (Beyler Decl., ¶ 4; **Exhibit 1,** Alameda County Sheriff's Office Crime Report, pp. 6, 12.) For these reasons, numerous extra security measures were put into place for this game. (*Ibid.*)

Prior to the game, various NBA officials had reported to local law enforcement concerns of potential security threats which included attempts to gain access to secure areas. (Beyler Decl. ¶ 4; **Exh. 1,** pp. 6.)  Additionally, there were recent instances of individuals circumventing security by using fake credentials. (Beyler Decl. ¶ 4; **Exh. 1,** pp. 6-7, 12-13.) At the pre-game security briefing, security personnel were instructed by NBA Executive Vice President and Chief Security Officer Jerome Pickett that everyone in both organizations had been briefed and that "**It doesn't matter who they are, who they say they are, you tell them Jerome Pickett says they are not going on the court without proper credentials**." (Beyler Decl. ¶ 4; **Exh. 1,** p. 13 (bold font added).) These strict orders were given by NBA to local law enforcement, including Deputy Strickland. (Beyler Decl., **Exh. 1,** p. 7, 13.)

Included among the heightened security protocols was a specific requirement for the type of credential that was needed by any person who wished to access the basketball court floor for the post-game Trophy Ceremony.  Evidence produced by the NBA in the course of discovery in this case, as well as evidence procured by the Alameda County Sheriff's Office and Oakland Police Department shows that there was no such thing as an "all-access credential" to gain entry onto the floor during the post-game celebration.  In fact, statements made by the NBA to law enforcement personnel, the Toronto Raptors, and other NBA security personnel, show that at the end of the game when the final buzzer sounded, all previously issued credentials became invalid for accessing the basketball court floor.  (Beyler Decl., **Exh. 1**, pp. 6, 13; **Exh. 4**, p. NBA000245; **Exh. 5**, p. NBA000180.)

The evidence further demonstrates that immediately after the buzzer, a stage and rope barriers were to be set up on the court for the Trophy Ceremony.  (Beyler Decl. ¶ 4; **Exh. 1**, pp. 7, 12, 13.) During the time when the stage and barriers were being set up, only a yellow arm band would permit access to the floor.  (Beyler Decl., **Exh. 1**, pp. 7, 12, 13; **Exh. 5**, pp. NBA000180.)  Then, after the stage and barriers were erected, only purple Trophy Credential holders would be permitted access to the floor.  (Beyler Decl. ¶ 4; **Exh. 1**, pp. 7, 12, 13 and attachments to the ACSO Report labeled

STRICKLAND000192-000197; **Exh. 5**, pp. NBA000180.)

NBA Security internal emails expressly demonstrate that after the final buzzer, all other passes, "including day passes" would be invalidated:

> As a reminder, there will be different credential/access control process in place post-game in the event of a Toronto win. ***NBA issued Finals credentials (to include Day Passes) will not allow holder to access onto the court until after the trophy presentation has concluded***. Unless you have a working function for the Trophy Presentation, ***stay away from the court*** until the presentation has concluded and all participants have cleared the court.

(Beyler Decl. **Exh. 4,** NBA000245.)

Prior to the game, various security officials with the NBA had communicated numerous times with the Toronto Raptors regarding increased security measures, including what the proper credentials were for the after-game celebration. Notably, these emails between the NBA and the Raptors included an admonition that the Raptors should communicate the security protocols to the team to avoid "an embarrassing security incident."

On Saturday, June 8, 2019 just before Game 5 – the game prior to the one in which the incident occurred involving Ujiri – NBA Security head Jerome Pickett emailed Jennifer Quinn of the Raptors' front office asking for a list of persons who should be issued a Trophy Ceremony credential and reminding her of protocols:

> Good evening Jennifer. Congratulations on going up 3 games in the series. Please see the below excerpts from the memo sent to teams from the trophy presentation procedures last month. Please not that stage participants are limited to **35**, and we will need the team to communicate to players, coaching staff and ownership who the approved individuals are as to avoid an embarrassing security incident pre-celebration…Special credentials will be supplied to all the above personnel (except for players uniform) and will be enforced by NBA security staff as well as Team-provided security staff for entry to the Trophy stage.

(Beyler Decl. ¶ 6; **Exh. 3,** p. NBA000169 (bold underline original.)

Subsequently, on June 9, 2019, the Raptors submitted their list of persons to receive Trophy Ceremony credentials and Mr. Pickett emailed again with further, even more specific, instructions, including the fact that non-Trophy Ceremony credentials would be invalid for accessing the floor after the game:

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

1
2
3
4
5
6
7
8
9
10
11
12

> At some point tomorrow, 100 Trophy Credentials (not armbands) will be delivered to you or your designee. These are not to be displayed by anyone until after the final buzzer (especially if it is a close game). There will be plenty of time for Trophy Credential holders to don this pass after the buzzer. It is important that everyone who receives these passes know that if the pass is lost, they will not be given another, and this is the only way to access the court for celebration. Prior to the final buzzer, all down-aisle access to the court will be frozen. At the final buzzer, **<u>ALL</u>** credentials will be invalid for accessing the floor except for the Trophy Credential. While the floor celebration and interviews are occurring, NBA Security, Team Security and Toronto Police will be clearing center court by the broadcast table for the stage to be brought out and assembled, and the trapezoid to be constructed. The only people on the court at this time are celebrating players, coaches, etc. media with armbands and security. Once the stage is certified and assembled and safe (approx. 8-10 minutes after final buzzer), your list of 35 will be allowed on-stage (no friends, family, guests outside of list of 35), and down-aisles will be open for Trophy Credential holders only so they can assemble on the court, outside the constructed trapezoid.

13
14

(Beyler Decl., **Exhibit 5, p.** NBA000180, Email dated June 9, 2019 from NBA Executive Jerome Pickett to Raptors official re: Game 5[1] Security in Toronto (bold underline in original).)

15
16
17
18
19

The NBA and officials from Oracle Arena explained the security screening protocols to security personnel at Game 6, including Lieutenant Liskey of the Alameda County Sheriff's Office, who then communicated to Deputy Strickland.  As Deputy Strickland explained to law enforcement investigators after the fact, his understanding of information provided in security staff briefing including the following:

20
21
22
23
24
25
26

> In the event the Toronto Raptors won, only those people with gold ribbons were allowed to the Court until a mobile stage was set up and a trapezoid of rope barriers were in place. The gold ribbons had a photo of a trophy imprinted on the front of it and the gold ribbons were to be worn as upper arm bands. After the stage and rope barriers were in place, NBA Security would allow persons with a plastic NBA Finals credential bearing the words Trophy Presentation on it to access the court. The purple colored trophy credential had visible writing which read NBA Finals 2019 on the top. On the right side of the credential read "Game 6." In the middle of the NBA credential is a photo of the NBA trophy that read "Trophy Presentation." Only one person would be allowed on the court per trophy credential. All persons with NBA credentials were to have them

27
28

---

[1] While the security measures at Game 6 were even more heightened than Game 5, the change of credentials was not a new security feature. Moreover, the teams were made aware of security issues involving credentials **<u>*before*</u>** Game 6.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT ANSWER AND COUNTERCLAIM

1

> visibly hanging around their neck on a lanyard. The credential is made of plastic
> and measures about 3.5" x 5".
> …
> Per the NBA security protocols, no other credentials or uniforms were valid and
> there would be no exceptions to allowing a person onto the floor without proper
> credentials.
> NBA Security would only grant access to the court through the North and South
> tunnel areas and these would be the only access areas onto the court.
> …
> Per AEG, during the last two minutes of the game, no person without a yellow
> armband or Trophy credential would be allowed to exit down onto the floor area
> of the court and all persons were redirected to the first-floor concourse for exit
> out of the arena.

(Beyler Decl. ¶ 4; **Exh. 1,** p. 7.)

Lieutenant Liskey, Strickland's supervisor, was the assigned Incident Commander for the Alameda County Sherriff's Office. Before the game, Lieutenant Liskey sent Mr. Strickland, and all other Alameda County Sheriff Deputies working security detail at the event, a text message which read as follows:

> In the event Toronto won: only yellow ribbons is allowed on the court until
> trapezoid was set. Once trapezoid is set then trophy credentials (purple) is
> allowed on court. 1 person per trophy pass only allowed period. Also green vest
> and black vest that says NBA Finals 2019 on back are allowed on court. No
> other credentials are accepted period. NBA Security will grant access to the
> court. North and South tunnel are only access point. "Only yellow armband is
> allowed to come down any of the aisles past the k9s. No one else is allowed to
> come down any of the aisles, period regardless of credentials, after stage and
> trapezoid is set, then trophy credentials ONLY can come down the aisles to the
> floor."

(Beyler Decl. ¶ 4; **Exh. 1,** p. 7.)

Following the incident, Lieutenant Liskey provided a statement regarding his security briefing preceding the event:

> The NBA Finals Game #6 was the last Warriors game ever to be played at
> Oracle Arena after 47 years and was also a possible NBA Finals Champion
> clinch game for the Toronto Raptors. Due to the high profile of Game #6 of the
> NBA Finals, numerous extra security measures were put into place for this
> game. The ACSO EOD team deployment for this game consisted of 14 Deputy
> Sheriffs, (7) explosive detection canines and their handlers and (7) EOD Bomb
> Technicians.
> …

7

[T]here was two possible scenarios for Game 6 of the NBA Finals:
1. The Golden State Warriors win the game and since it's the last game ever to play at Oracle Arena they feared people would try to storm the court and may even try to steal items for memorabilia from the court area of the arena including seats. In the event the Warriors win, there would be a commemorative thank you video to the fans in Oakland for 47 years of support.
2. The Toronto Raptors win the game and become the 2019 NBA World Champions, there would be a trophy presentation for the Raptors Team on the court. This would require a Trophy Stage and trapezoid rope barrier to be set in place. The only approved credentials for the trophy presentation would be a gold arm band prior to the stage being set in place and then a plastic, purple in color, trophy credential after the stage is set up and the trapezoid rope barrier is in place. We were told if the Raptors won the game, then all other NBA credentials were no longer valid and the only credentials that were valid were the yellow armband and the purple trophy credential.

(Beyler Decl., **Exh. 1,** pp. 12-13.)

Reproduced below are copies of the credentials, arm band, and vest issued for the Trophy Ceremony which were included as attachments in the Alameda County Sheriff's Office Crime Report (*see* Beyler Decl., **Exh. 1,** at pp. STRICKLAND 000192-000196):



**(ii)    The Incident.**

On June 13, 2019, Mr. Strickland was working security detail in his capacity as an Alameda County Sherriff Deputy. Mr. Strickland was readily identifiable as a peace officer. He was dressed in his issued Alameda County Sherriff's Office Explosive Ordinance Disposal (EOD) K-9 uniform, consisting of a tactical outer carrier with a cloth name embroidered badge. He was also wearing an Alameda County Sherriff's Office baseball cap with a patch which read Alameda County Sherriff in yellow and blue. Mr. Strickland was also wearing his assigned body camera. (Beyler Decl. ¶ 4; **Exh. 1,** p. 6.) Mr. Strickland was assigned to the floor aisle in the area of section 107 next to the South

8

Tunnel. (Beyler Decl. ¶ 4; **Exh. 1,** p. 8.)

The Raptors won the game and, therefore, the 2019 NBA Finals. Mr. Strickland was standing a few paces behind an AEG employee wearing a dark blue suit. The AEG employee was responsible for checking and authenticating credentials before anyone would be given access to secured areas including the basketball court floor.  Mr. Strickland was the "last line of defense" if a person attempted to circumvent the AEG employee and access an area without showing authorization, as Mr. Ujiri did here.

Shortly after the game, at around 8:45 p.m., Mr. Strickland was at his assigned position when an unidentified man in a dark suit, later identified as Raptor's President Masai Ujiri, was walking towards Mr. Strickland's position. Mr. Strickland did not know who Mr. Ujiri was before this incident. What Mr. Strickland did notice was that Mr. Ujiri was not wearing his credentials around his neck, he was not wearing a gold armband, and he failed to stop and present his credentials to the AEG guard who was responsible to verifying and authenticating credentials to get to the court. (Beyler Decl. ¶ 4; **Exh. 1,** p. 8.)

Deputy Strickland gave Mr. Ujiri both verbal commands to stop and present his credentials and used his left index finger to point Mr. Ujiri back to the AEG official. Mr. Ujiri ignored Deputy Strickland's commands and swatted his hand away. Due to Mr. Ujiri's evasive behavior and his refusal to stop and present his credentials, Mr. Strickland had no alternative but to physically stop Mr. Ujiri. Mr. Strickland pushed Mr. Ujiri backwards with an open-handed push using both hands to Mr. Ujiri's chest. Mr. Ujiri once again ignored Mr. Strickland's commands to return and present credentials and again tried to circumvent Mr. Strickland by walking past him. Once again, Mr. Strickland had no alternative but to physically stop Mr. Ujiri. Mr. Strickland pushed Mr. Ujiri backwards with an open-handed push using both hands to Mr. Ujiri's chest.

At approximately the time in which Mr. Strickland physically stopped Mr. Ujiri for the second time, there was an unidentified man who came from the direction of the folding chairs next to the basketball court. This unidentified man stepped over the chairs towards Mr. Strickland and placed

his hand and body weight on Mr. Strickland left shoulder trapping Mr. Strickland's left arm. At this



precise moment, Mr. Ujiri charged at Mr. Strickland and struck Mr. Strickland in the upper torso and

neck area with his left hand and in the face with his right hand.

(Beyler Decl. ¶ 11; **Exh. 8**; **Exh**.   10, Video from which the still frame above was taken, filed

manually with the Court pursuant to Local Rule 5-1.)

Following the incident, Masai Ujiri was interviewed by two Oakland Police Officers in a

security office at Oracle Arena. According to the Oakland Police Department report, Mr. Ujiri

provided a recorded statement admitting that he was excited, in a rush, and tried to push past

Strickland.  The officer's summary of the stat attributed to Mr. Ujiri is as follows:

> [Mr. Ujiri] believed that most people in attendance at the game (both fans and
> staff) were aware of who he was and would recognize him. Towards the end of

the game, he walked to his wife sitting in the designated Raptors friends and family section. As the game concluded, [Mr. Ujiri] approached the court and was stopped by a police officer, asking for his credentials. [Mr. Ujiri] did not understand why [Deputy Strickland] was preventing him from accessing the court to celebrate his teams win and advised he was their President. As he was explaining who he was to the police officer, he stated he was **"rushing with excitement"** to get on to the court **and pushed the officer away in an effort to get by him**. [Mr. Ujiri] believed he may have had his credentials in his hand at the time. [Mr. Ujiri] stated that the officer may have perceived his pushing as aggressive. The police officer then pulled [Mr. Ujiri] back away from the court and pushed him.

(Beyler Decl. ¶ 5; **Exh. 2**, p.STRICKLAND000176, Oakland Police Department Crime Report (bold font added for emphasis).)

**(iii)    Ujiri Did Not Possess Proper Credentials to Access the Court**



Video and photographs were captured from the moments just before Ujiri assaulted Deputy

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

Strickland.  They show that Ujiri did not have the Trophy Ceremony credential or the yellow arm band required to access the court after the final buzzer.  Viewed in contrast to the photo of the Trophy Ceremony credential attached to the Sheriff's Office Report (Beyler Decl. ¶ 4; **Exh. 1,** at pp. STRICKLAND 000192) it is clear that what Ujiri was holding was not the Trophy Ceremony credential.  Additionally, photos of Ujiri seconds before the incident show he was not wearing a yellow arm band.

Above, on the top left is a copy of the credentials Mr. Ujiri was required to wear to get access to the Court, on the right is what Mr. Ujiri had on his person, the bottom right is an exemplar of the expired NBA pass attached to Alameda County Incident Report as **Exhibit 1.**   (Beyler Decl. ¶¶ 4, 12; **Exh. 1,** pp. 15-20; **Exh. 9**.)

In addition to the photos above, Mr. Ujiri's own responses to Strickland's written discovery requests in this case are evidence that he did not have the Trophy Ceremony credential or the yellow arm band.  For example, Mr. Ujiri's response to Strickland's Request for Admission Number 1 is tantamount to an admission Ujiri did not have the correct credential to go on the court. The request asks Ujiri to admit "YOU did not possess on YOUR person the proper security clearance credential as required to gain access to the basketball court."  Ujiri responded as follows: "When Mr. Ujiri encountered Plaintiff Alan Strickland, he was in possession of a credential that allowed him free access within Oracle Arena. He had no other credential on him at that time." (Beyler Decl., **Exh**. 12, p.2:24-27, Ujiri's Response to RFAs.)

Ujiri's response to Strickland's second Request for Admission reflects on the Raptors' failure to provide Ujiri with the proper credential.  That request asks, "Admit that before the INCIDENT YOU were provided with ALL the applicable SECURITY DOCUMENTS."  Ujiri responded: "Prior to the INCIDENT, Mr. Ujiri does not recall being provided with any SECURITY DOCUMENTS." (Beyler Decl., **Exh**. 12, p.3:7-8, Ujiri's Response to RFAs.)

Ujiri's response to Strickland's Special Interrogatory Number 14 is similar, the interrogatory asks: "If ANY of YOUR responses to PLAINTIFF's Request for Admission, set one, is not an unqualified admission, then describe ALL facts upon which you base YOUR response."  Ujiri

responded:

> When Mr. Ujiri encountered Plaintiff Alan Strickland, he was in possession of a
> credential that allowed him free access within Oracle Arena. He had no other
> credential on him at that time.
>
> Prior to the INCIDENT, Mr. Ujiri does not recall being provided with any
> SECURITY DOCUMENTS.
>
> Prior to the INCIDENT, Mr. Ujiri does not recall being made aware of any
> SECURITY DOCUMENTS.

(Beyler Decl., **Exh**. 13, 15:1-8, Ujiri's Response to Special Interrogatories.)

### (iv)   Further Background Information Subject to Administrative Motion to File Under Seal.

In the course of discovery in this case, the National Basketball Association has produced certain documents and information that is highly probative of the issues involved in this motion.  In particular, certain material produced by the NBA relates to the issue of whether or not Ujiri had the proper credential to access the basketball court after the game, as well as Ujiri's misrepresentation that his "all access credential" somehow was sufficient to access the court.

Unfortunately, some of the most probative materials produced by the NBA have been marked as "Confidential" and subject to the July 31, 2020 protective order.  Plaintiffs believe that much of this material has been improperly designated as Confidential and is not entitled to protection.  The parties have begun meeting and conferring regarding the de-designation of some of the improperly designated materials; however, the de-designation process takes time under the procedure set forth in the protective order.  Plaintiffs are now under a short deadline to respond to Defendants' motion for leave to file the counterclaim, and therefore there is not sufficient time to complete the de-designation procedure before this opposition must be filed.

Thus, Plaintiffs are filing an Administrative Motion to File Under Seal pursuant to Section 12.3 of the Protective Order (Docket No. 34, p.10:7-16), and Local Rules 7-11 and 79-5(d) and (e).

A motion pursuant to Local Rule 79-5(d) and (e) is specifically permitted under Section 12.3 of the Protective Order.  Pursuant to Local Rule 79-5(d), an Administrative Motion to Seal comes under Local Rule 79-5(e) when the sole basis for sealing is that the documents were previously designated as confidential by another party under a protective order.  Pursuant to Local Rule 79-5(e), and Section 12.3 of the Protective Order, unless the NBA can show that these materials are "sealable" – i.e. privileged, trade secret, or otherwise entitled to protection under law – the Court should allow the filing of the documents in the public record.  Plaintiffs submit that the NBA will not be able to make such as showing and ask that if the Court deems the documents "not sealable" then those particular documents be should be filed and be considered incorporated into these opposition papers as exhibits.

Notably, the materials subject to Plaintiffs' Administrative Motion to File Under Seal are not all of the documents produced by the NBA that Plaintiffs believe were improperly designated as Confidential.  It is a very small amount of very important information.  Plaintiffs intend to continue with the formal de-designation process set forth in the protective order for the remaining documents improperly designated as confidential.

**B.  Procedural History.**

On February 7, 2020, Plaintiffs filed their lawsuit. (Doc. No. 1.) On April 2, 2020, Defendants filed a joint answer. (Doc. No. 18.) The joint answer stated, in relevant part, as follows:

> As Mr. Ujiri attempted to make his way onto the court to join his team and fulfill his duties as Raptors' President, he encountered Plaintiff Alan Strickland. Mr. Strickland was working as a security guard at the game. As Mr. Ujiri attempted to enter the court, **Mr. Strickland assaulted him, forcefully shoving him back once and then twice.** Mr. Ujiri then shoved Mr. Strickland in the chest. Other than the shoves, the two men did not have any further physical contact with each other. The entire encounter between Mr. Strickland and Mr. Ujiri was brief.

(Doc. No. 18, ¶ 3:17-22 (emphasis added).)

On May 7, 2020, Defendants served their Rule 21(a)(1)(A)(ii) Disclosure. In Defendants' initial disclosure they stated they had the following evidence "…videos of the incident giving rise to the lawsuit; pictures of the incident giving rise to this lawsuit." (Beyler Decl. ¶ 9; **Exh. 6,** Defendants' Initial Disclosure, p.2:6-7.)

On May 11, 2020, the Court issued a Case Management and Pretrial Order.  The Case Management and Pretrial Order indicates that the deadline for amending pleadings has passed and amendments may only be made pursuant to Federal Rule of Civil Procedure 16(b)(4).  (Docket No. 30,  Case Management and Pretrial Order, ["LAST DAY TO JOIN PARTIES OR AMEND PLEADINGS: Only with court approval for good cause by Motions under FRCP 16(b)(4)"].)

On May 13, 2020, Defendants' legal counsel, Emanuel Townsend emailed two video clips to the Court as ordered by the Court at the CMC hearing on May 11, 2020.  (Beyler Decl., **Exh. 7** emails from Defendants' counsel.) Both videos provided by Defendants were already in Defendants' possession and were not provided by Plaintiffs at that time. (Beyler Decl., **Exh. 7** emails from Defendants' counsel.)  These videos show both Mr. Ujiri and Deputy Strickland in the altercation respectively.  The body camera video which plaintiff produced on July 17, 2020 did not reveal any new information to Defendants.

On June 22, 2020, Defendants served responses to Plaintiffs' Request for Production of Documents which, among other requests, sought the production of videos referenced in Defendants' Initial Disclosure served on May 7, 2020. (Beyler Decl. ¶ 9; **Exh. 6**.) On July 16, 2020, Defendants produced three videos of the incident, one of which was already provided to the Court on May 13, 2020. (Beyler Decl. ¶¶ 13-14.)

## IV.   **ARGUMENT**

In this case, the Court's Pre-Trial Scheduling Order expressly limits motions for leave to amend the pleadings to those brought under Federal Rule of Civil Procedure 16(b)(4).  Through this motion, Defendants are attempting to circumvent the Court's scheduling order and the precidential case law governing whether a motion to amend must be brought pursuant to Rule 15 or Rule 16.  While Defendants argue that the motion is brought under both Rule 15(a) and Rule 16(b)(4), only Rule 16(b)(4) is proper.  Nonetheless, the standards have not been met for either rule.

Generally, there are two ways a party can amend a pleading before the issuance of a scheduling order: (1) the opposing party/parties provide written consent, or (2) the court gives permission. (Fed. R. Civ. P. 15(a)(2).) Federal Rules of Civil Procedure 15(a) provides that

amendment shall be granted "freely when justice so requires." But this standard changes and becomes progressively more difficult to meet as litigation proceeds toward trial. (*Byrd v. Guess,* 137 F.3d 1126 (9th Cir. 1998).) If the deadline to amend pleadings set in the court's pretrial scheduling order has passed, the legal standard for amending a pleading is governed by Rule 16, not Rule 15. (*See Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1294 (9th Cir. 2000); Fed. R. Civ. P. 15(a)(2).) Once the district court enters a scheduling order setting forth a deadline for the amendment of pleadings, modifications are allowed only upon a showing of "good cause." (*Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 608 (9th Cir. 1992).)

### A. Federal Rules of Civil Procedure 16(b)(4).

Federal Rule of Civil Procedure 16 governs deadlines and dates set by the Court. In the absence of "good cause" the court will not modify the scheduling order under Federal Rule 16(b)(4). (*See Johnson, supra,* 975 F.2d at 608.) The inquiry under Rule 16(b)'s "good cause" standard first focuses on the diligence of the party seeking the amendment. (*foman, supra,* 232 F.3d at 1294.) "The Good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." (*In re Western States Wholesale Natural Gas Antitrust Litigation,* 715 F.3d 716, 737 (9th Cir. 2013).) "The district court may modify the pretrial schedule 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" (*Johnson, supra,* at 609.)" "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. "If a party seeking modification 'was not diligent, the inquiry should end' and the motion to modify should not be granted." (*Zivkovic v. Southern Cal. Edison Co.,* 302 F.3d 1080, 1087 (9th Cir. 2002).) Furthermore, the moving party must not simply ask for leave to amend its pleading, but must also request the court to modify its scheduling order when seeking to amend under Rule 16. (*Johnson, supra,* at 608-609.)

The Rule 16(b)(4) analysis is also a different standard than the Rule 16(e)'s "manifest injustice" standard. Rule 16(e) analysis is only when a Pre-Trial Conference has occurred. (*See*

*Jimena v. UBS AG Bank, Inc.,* 2011WL 13185645 *2; *see also Jimena v. UBS AG Bank, Inc.,* 2011 WL 587309 *6, n. 5 (E.D. Cal. 2011).) Good cause does not exist when a party knows throughout the legal proceeding who a proper party to sue was, but only choses to sue that party after the court's deadline to amend had passed. (*Janicki Logging Co. v. Mateer,* 42 F.3d 561, 566-567 (9th Cir. 1994).) Similarly, in *Johnson, supra,* 975 F.2d at 609, the Ninth Circuit stated that good cause to amend did not exist because the moving party had been made aware that not all necessary parties were joined prior to the passage of the deadline to amend. That failure to amend the pleading in time did not satisfy rule 16's good cause standard. (*Ibid.*)

The real issue for Rule 16(b)(4) is whether the original scheduling order date could have been met had the party acted diligently. It therefore looks to activity (or lack of activity) occurring before the expiration of the pertinent date, not a party's activity or inactivity after the expiration of that date. Based on this evidence, it is clear that when Defendants filed their original Answer, they had video evidence showing what happened in the altercation between Strickland and Ujiri. Additionally, Ujiri was present in-person at the June 13, 2019 incident and had every reason to know what he believed occurred from the moment it actually happened.

Delaying bringing this motion until now not only demonstrates that defendants were not diligent, but that they brought this Motion in bad faith to impact the perception of the case held by the public and the media. (*Zivkovic, supra*, 302 F.3d at 1087 "If a party seeking modification 'was not diligent, the inquiry should end' and the motion to modify should not be granted."; *see also In re Western States Wholesale Natural Gas Antitrust Litigation, supra,* 715 F.3d at 739 "Late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action".)

> **(i)** **Defendants' have not, and cannot, establish "good cause".**

Here, Defendants' have failed to specifically request the Court to modify its scheduling order. (*See Johnson, supra,* at 608-609.) But even if Defendants had specifically requested the Court to modify its scheduling order, Defendants have failed to explain what "good cause" supports their Motion. Defendants frame their motion as one under Federal Rule of Civil Procedure 15(a). As noted

1    above, this is simply not proper since the Court has issued a Case Management and Pretrial Order

2    only allowing a joinder of parties or amendment of pleadings by "good cause" under Rule 16(b)(4).

3    (*See* Doc. No. 30; *see also* Sect. II, B., *supra*.)

4         Good cause cannot be met under Rule 16(b)(4) because the reason asserted for bringing this

5    Motion after the deadline is patently false. As noted above, Defendants' stated in their joint answer

6    on April 2, 2020 that Plaintiff Alan Strickland shoved Defendant. (*See* Doc. No. 18; *see also* Sect. II,

7    B., *supra*.) According to Defendants' Initial Disclosures, they had the video evidence as early as May

8    8, 2020. (Beyler Decl. ¶ 9; **Exh. 7**.) Furthermore, Defendants provided the Court with a video on

9    May 13, 2020. The only new video angle provided by Plaintiffs' in discovery is Plaintiffs' body

10   camera. However, as the Court can clearly see, the video provides no new evidence. In fact, the body

11   camera shows a less detailed version of the interaction than the videos which were already in

12   Defendants possession at the time of filing their joint answer on April 2, 2020.  And, even more

13   importantly, the body camera shows the same events that unfolded right in front of Ujiri's eyes in-

14   person.  "Even under Rule 15, a district court does not abuse its discretion by denying amendment

15   when "the movant present[s] no new facts but only new theories and provide[s] no satisfactory

16   explanation for his failure to fully develop his contentions originally." (*Millenkamp v. Davisco Foods*

17   *Intern., Inc.,* 448 Fed.Appx. 720, 721 (quoting *Vincent v. Trend W. Technical Corp.,* 828 F.2d 563,

18   570-571 (9th Cir. 1987).)

     **B.  Federal Rule of Civil Procedure 15(a).**

19

20        Even if Defendants motion was proper under Federal Rule of Civil Procedure 15(a), the

21   factual and procedural standards would not be met for leave to be granted.

22        Federal Rule of Civil Procedure 15(a) declares that leave to amend "shall be freely given

23   when justice so requires." (Fed. R. Civ. P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182 (1962).)

24   However, reasons such as undue delay, bad faith, or dilatory motive on the part of the movant, undue

25   prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.

26   are grounds for denying leave to amend.  (*Foman, supra,* at 182.) The factors discussed in *Foman*

27   are not of equal weight. (*Howey v. United States,* 481 F.2d 1187 (9th Cir. 1973).) "Where prejudice

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

is shown or the movant acts in bad faith are courts protecting the judicial system or other litigants when they deny leave to amend a pleading." (*Howey, supra,* at 1191.)

Defendants cannot meet the requirements of Rule 15(a) because of their bad faith basis for filing this motion, their undue delay, and the prejudice this motion casts upon Plaintiffs.

**(i)      Bad Faith.**

Black's Law Dictionary defines "bad faith" as "dishonesty in belief, purpose, or motive." (*Black's Law Dictionary* 166 (10th ed. 2014). "Bad faith in this context is said to be conduct violating community standards of decency, fairness, or reasonableness." (*cf. Pulte Home Corp. v. American Safety Indemnity Co.* (2017) 14 Cal.App.5th 1086.)

"Examples of bad faith have included-but are not limited to-instances where a party makes a claim without alleging any newly discovered facts, makes a tactical decision to omit a claim…or includes a claim to harass or burden the other party." (*Stearns v. Select Comfort Retail Corp.,* 763 F.Supp.2d 1128 (Cal. N.D. 2010).) "It is very clear, however, that 'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of litigation." (*Hall v. Cole,* 412 U.S., 1, 15 (1973).) "Only where prejudice is shown of the movant acts in bad faith are court's protecting the judicial system or other litigants when they deny leave to amend a pleading." (*Howey v. U.S.,* 481 F.2d 1187, 1191.)

Here, Defendants asked the Court for an early mediation which Plaintiffs agreed to and which took place on August 11, 2020. Since this matter did not resolve at mediation, Defendants have now asserted this counterclaim simply as a vehicle to rationalize the posting – with no context – of video footage to Defendants' law firm webpage.  This is procedurally improper, violates Local Rule 5-1, and serves no purpose other than to fan the media flames, tarnish Plaintiffs' reputation, and poison the jury pool. (*GetFugu, Inc. v. Patton Boggs, LLP,* 220 Cal.App.4th 141, 153 "litigating in the press… [results in the] poisoning of jury pools and bringing disrepute upon both the judiciary and the bar.")

As discussed above, the video evidence provided no new evidence or information beyond what was already or known to Defendants. In reality, Defendants brought this motion to take

1    advantage of the now pervasive anti-law enforcement prejudices and to falsely allege racial animus

2    and prejudicial bias is the reason for Plaintiff Alan Strickland's conduct on the date of the incident.

3            Substantial evidence demonstrates that Defendants, and their legal counsel, have brought this

4    motion in bad faith. In Defendants' proposed amended answer, paragraph 18, lines 9-10,

5    "[e]yewitness testimony and video evidence also confirm that Mr. Ujiri pushed Mr. Strickland back

6    in the chest with two hands only *after* Mr. Strickland assaulted him by shoving him forcefully twice."

7    This is clearly false and is inconsistent with the evidence, including Mr. Ujiri's statements to the

8    Oakland Police Department.

9            For example, following the incident, Mr. Ujiri provided a statement to Oakland Police

10   Department where he stated: he was **"rushing with excitement"** to get on to the court **and pushed**

11   **the officer** away in an effort to get by him. [Mr. Ujiri] stated that the officer **may have perceived**

12   **his pushing as aggressive**." (Beyler Decl. ¶ 5; **Exhibit 2.**)

13           Mr. Ujiri already conceded that he pushed Mr. Strickland first. Video evidence shows Mr.

14   Ujiri swatting Mr. Strickland's hand away from him. Mr. Strickland was trying to prevent a scene

15   and stop Mr. Ujiri so he could communicate with Mr. Ujiri and determine whether or not Mr. Ujiri

16   had valid credentials. The NBA had expressly declared that no one was allwed on the court without

17   Trophy Ceremony credentials or a yellow arm band.  Mr. Ujuri had neither but "excitedly" attempted

18   to rush past Strickland onto the basketball court.

19           The evidence shows why Ujiri did not stop to produce his Trophy Credential –  he did not

20   have it.

21           Defendants state throughout their proposed joint amended answer and counterclaim that Ujiri

22   had an "all-access credential that allowed him to access virtually every part of Oracle Arena,

23   including the location he was at when he encountered Mr. Strickland." (*See* Defendants' Proposed

24   Amended Answer, paragraph 18, lines 19-20.)   This statement itself constitutes a bad faith

25   misrepresentation carefully crafted to mislead the Court.

26           As detailed above, the NBA officials provided Raptors officials with notice about heightened

27   security and credential checks throughout the 2019 NBA playoffs. Specifically, after the game ended

28   credentials worn by team staff and management became ineffective. (Beyler Decl. ¶ 4; **Exh. 1,** pp.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

6-7, 12-13.) Mr. Ujiri did not have the correct credential. Moreover, he was not wearing the golden armband – *both* of which were required for him to access the court. (*See* Beyler Decl. ¶ 12; **Exh. 9**; *See also infra.*)

This is consistent with Ujiri's responses to Strickland's written discovery in which he states he had a pass that permitted him free access in Oracle, but no other credential.  (*See* Beyler Decl., **Exh**. 10-11.)

In short, it is indisputable that Mr. Ujiri did not have the gold arm band on. Moreover, it is clear from this frame of Mr. Strickland's body camera that Mr. Ujiri still had his expired NBA Finals pass. Defendant's assertion that Ujiri had an "all access pass" is an intentional obfuscation designed to mislead the Court and the public and hide the fact that Ujiri was attempting to push past Strickland because he did not have the Trophy Ceremony credential.  This is bad faith.

As for Mr. Strickland's injuries, his medical records, treating physicians, and Plaintiffs medical experts will establish his injuries at trial.  Frames taken from the arena security footage clearly shows Mr. Ujiri striking Mr. Strickland **in the face.** (Beyler Decl. ¶ 11; **Exh. 8**.) Mr. Ujiri's representation that there was no hit to the face, and no double straight arm punch is simply contradicted by the evidence.  This is also bad faith.

    **(ii)**    **Undue Delay.**

While delay alone will not justify denial of leave to amend, "late amendments to assert new theories are not reviewed favorable when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." (*Stearns, supra,* 763 F.Supp.2d at 1159.)

As noted above, Defendants acknowledged that Plaintiff Alan Strickland pushed Defendant Masai Ujiri twice in their original joint answer (*See* Doc. No. 18), they acknowledge possession of video evidence on May 8, 2020 (*see* Beyler Decl. **Exh. 7**), they produced video evidence to the court on May 13, 2020 (Beyler Decl. ¶ 9; **Exh. 6**), and they produced all of their video evidence on July 16, 2020. (Beyler Decl. ¶ 10; **Exh. 7**.) Not only have Defendants failed to provide an explanation for this delay, they misrepresented to the Court the reason for the delay was due to the recent production of the body camera. However, as discussed above under Section II, B, this is clearly false.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED JOINT
ANSWER AND COUNTERCLAIM

**(iii)     Prejudice.**

The Ninth Circuit has recognized the delay in bringing a motion to amend a pleading for the purpose of forcing the party to incur unnecessary expenses demonstrates not only bad faith, but is prejudicial to the nonmoving party. (*See Owens v. Kaiser Foundation Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir. 2001).)

As discussed above, Defendants Motion was brought in bad faith which, according to *Owens*, a district court may find that it is also prejudicial to the nonmoving party. If the Court allowed Defendants' to file an amended answer and counterclaim, it would require Plaintiffs to retain additional experts and substantially increase the cost of litigation. Moreover, it would require pushing out discovery deadlines/cutoff, and likely trial. Based on the evidence detailed above, it is clear that Mr. Ujiri was in the wrong – he was the initial aggressor, he pushed Mr. Strickland, refused to follow his lawful commands, and then punched him the chest and face. Despite Defendants attempts to damage Plaintiffs' reputation, this incident was not about race. Simply stated, Mr. Ujiri was not authorized to access the basketball court with the credentials he had, and the NBA had repeatedly informed the Raptors about the strict credential requirements.

Ironically, the slight inconvenience security-credentials may impose on people like Masai Ujiri, it is designed to keep him, his players, his staff, and all the fans safe.

## V.     CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion in its entirety.

DATED: September 1, 2020                    **MASTAGNI HOLSTEDT, A.P.C.**

By: /s/ BRETT D. BEYLER
BRETT D. BEYLER
Attorneys for Plaintiffs